**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| OLD REPUBLIC INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 03 C 5238 |
| | ) |
| NESS, MOTLEY, LOADHOLT, | )   Judge Blanche M. Manning |
| RICHARDSON & POOLE, P.A.; | ) |
| RICHARDSON, PATRICK, WESTBROOK | ) |
| & BRICKMAN, LLC; H. BLAIR HAHN; | ) |
| MICHAEL J. BRICKMAN; TERRY E. | ) |
| RICHARDSON, JR.; INTERCLAIM | ) |
| HOLDINGS, LTD; INTERCLAIM | ) |
| RECOVERY, LTD; and TWIN CITY FIRE | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM AND ORDER

Before the court is Old Republic's motion for summary judgment as to Counts I, II, VI,

VIII, and X of its First Amended Complaint and Twin City's cross-motion as to Count X. For

the reasons stated herein, the motions are denied.

**I.     FACTS**

The present action stems from a judgment entered against the now defunct law firm of

Ness, Motley, Loadholt, Richardson & Poole, P.A. (NMLR&P). *See Interclaim Holdings, Ltd. v.*

*Ness, Motley, Loadholt, Richardson & Poole*, 2001 WL 1313799 (N.D. Ill. Oct. 29, 2001)

(hereinafter "Underlying Action"). Defendants Interclaim Holdings, Ltd. and Interclaim

Recovery, Ltd. (collectively "Interclaim") filed the Underlying Action on December 4, 2000,

against NMLR&P alleging that it engaged in wrongdoing in connection with its representation in

the prosecution of certain class action claims that took place in the Circuit Court of Madison

County, Illinois.  The jury in the Underlying Action found NMLR&P breached its fiduciary duty and the parties' retainer agreement and awarded Interclaim $8.3 million in compensatory damages and $27.7 million in punitive damages.  NMLR&P filed a motion for a new trial, judgment as a matter of law, and remittitur, which the district court denied.  *See Interclaim Holdings, Ltd. v. Ness, Motley, Loadholt, Richardson & Poole,* 298 F.Supp.2d 746 (N.D. Ill. 2004) *as amended* 2004 WL 725287 (N.D. Ill. April 1, 2004).  The defendants appealed.  On appeal, the parties settled the case and the appeal was dismissed.  Defendant Twin City Fire Insurance Company, who issued the $20 million primary professional liability insurance policy to NMLR&P ("Twin City Policy"), settled the Underlying Action in excess of the $20 million limit of liability of the Twin City policy.[1]

The individual defendants in the present action are now members of and are practicing law with defendant Richardson Patrick, a South Carolina law firm.  At issue are two "claims made and reported" Excess Professional Liability policies ("Policies") Old Republic issued to NMLR&P and its individual attorneys.[2]  The Policies had effective dates of August 15, 2000 to August 15, 2001 ("First Policy") and August 15, 2001 to August 15, 2002 ("Second Policy").

---

[1]Old Republic asserts that Twin City had no obligation to pay any portion of the judgment and that the payment by Twin City was therefore a voluntary payment that not does not exhaust the $20 million limit of the Twin City Policy.  This claim by Old Republic along with others is pending before Judge Guzman, *Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, No. 04 C 8335.

[2]According to Old Republic, defendants Motley Rice, L.L.C. and MRRM, P.A. contend that they are successors to or are related to NMLR&P, the entity to whom the insurance policies were issued.  These three entities are referred to as Ness Motley.  The other defendants, Richardson, Patrick, Westbrook & Brickman, L.L.C., H. Blair Hahn, Michael J. Brickman and Terry E. Richardson, Jr. ("Richardson Patrick") also apparently assert status as insureds under the excess policies at issue.  Ness Motley and Richardson Patrick are collectively referred to as the Insureds.

Old Republic seeks a determination that it has no duty to defend, indemnify, or reimburse defense costs or make indemnity payments to the defendants.

The Policies are "claims made and reported" policies. Specifically, the Policies contain the following language:

> The Company [Old Republic] shall provide to the Insured insurance coverage for any Loss on account of any Claim first made against the Insured during the Policy Period or the Extended Reporting Period (if exercised) and reported to the Company in accordance with Clause V.A.

Clause V.A. states:

> The Insured shall as a condition precedent to their rights under this Policy, give to the Company written notice of any Claim made against the Insured as soon as practicable but in no event later than sixty (60) days after the end of the Policy Period or the Extended Period (if exercised) in which such Claim was made. Such written notice shall be given to the Company regardless of the amount of the Claim or the Underlying Limit.

Loss is defined as follows:

> "Loss" means, to the extent for which coverage would be provided under the Primary Policy, (i) damages, judgments, or settlements and (ii) reasonable costs, charges, and expenses associated with the investigation, defense and appeal of any Claim.

Finally, the Policies contain a provision which states that "[a]ll notices under this Policy shall be in writing and be mailed or delivered to the appropriate party. Notice to the Company shall be mailed or delivered to Old Republic Insurance Company c/o Chicago Underwriting Group, Inc., 211 West Wacker Drive, Chicago, IL 60602."

Old Republic argues that the Policies do not cover the Underlying Action because (1) while the claim was first made against Ness Motley on December 4, 2000 (when the Underlying Action was filed), the Insureds did not report the claim to Old Republic until April 15, 2002,

after the period of the First Policy--and since coverage is only provided for claims that are reported during the policy period in which the claim was first made, this claim is not covered; (2) coverage is unavailable because Illinois public policy prohibits insurance coverage for punitive damages arising out of one's own conduct; and (3) coverage for punitive damages is also barred by the exclusion for claims involving "actual dishonest, fraudulent, criminal or malicious" conduct and because the jury instruction in the Underlying Action provided that punitive damages could be awarded only if Ness Motley's conduct was willful or wanton and punitive damages were awarded, the exclusion applies.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuinely disputed issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).  When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.  *See, e.g., Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). A triable fact issue exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Schuster*, 327 F.3d at 573 *(quoting Wade v. Lerner New York, Inc.*, 243 F.3d 319, 321 (7 th Cir. 2001) (quotation omitted)).

The movant bears the initial burden of establishing that there is no genuinely disputed issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims," the non-movant

must then present specific facts showing that there is an issue for trial. *Michael v. St. Joseph County, et al.*, 259 F.3d 842, 845 (7th Cir. 2001) (quoting Fed.R.Civ.P. 56(e)). To successfully oppose the motion, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue. *Celotex*, 477 U.S. at 324. A scintilla of evidence in support of the non-movant's position is insufficient to defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. ANALYSIS

### A. Old Republic's Motion for Summary Judgment

#### 1. *Counts I & II – Insureds Failed to Timely Report the Underlying Action*

##### a. <u>Did Ness Motley Timely Report the Underlying Action?</u>

According to Old Republic, Ness Motley failed to provide written notice to Old Republic of the claim during the period of the First Policy when the claim was made. On the other hand, Ness Motley argues that it gave timely oral notice either through Terry Richardson and/or Francis Ray, both associated with Ness Motley. Ness Motley asserts that because a genuine issue of material fact exists as to whether Old Republic received oral notice of the claim during the appropriate time period, summary judgment should be denied.

As noted by Old Republic, coverage under the claims-made policies at issue is triggered only if: (a) the claim is made during the policy period; and (b) the claim is reported during the policy period. *See American Nat. Fire Ins. Co. v. Abrams*, No. 99 C 5807, 2002 WL 243455, at *3 (N.D. Ill. Feb. 19, 2002) ("Unless these two conditions occur, no coverage is provided under

the claims-made policy.") (internal quotations marks and citation omitted). If the reporting

requirements in the Policies were not satisfied, then Old Republic's duties to defend and

indemnify were not triggered. *Id.* (citing cases); *St. Paul Reinsurance Co. v. Williams &*

*Montgomery, Ltd.*, 00 C 5037, 2001 WL 1242891, at *2 (N.D. Ill. Oct. 17, 2001) ( "If notice

[under a claims-made policy] is not given, then the carrier is under no obligation to indemnify the

insured.") (citations omitted).

> One court has explained the reporting requirement in claims-made policies as follows:

>> [t]he reporting requirement in a claims made policy is an element of coverage
>> because it helps define the scope of coverage under the policy.
>> . . .
>> It defines the scope of coverage by providing a date after which the insurer is no
>> longer liable under the policy. This is because the purpose and function of the
>> reporting requirement of a claims made policy is to eliminate an insurer's 'tail'
>> exposure by minimizing the time between the insured event and the payment. As
>> this provides insurers with greater certainty as to their exposure to liability,
>> insureds under this type of policy pay lesser premiums and receive broader
>> coverage.

*Abrams*, No. 99 C 5801, 2002 WL 243455, at *3 (internal quotations marks and citations

omitted). "Given the purpose and function of the reporting requirement in a claims made policy,

such reporting requirements are strictly construed." *Executive Risk Indemnity, Inc., v. Chartered*

*Benefit Servs. Inc.*, No. 03 C. 3224, 2005 WL 1838433 (N.D. Ill. July 29, 2005) (internal

quotation marks and citation omitted).

> Old Republic contends that because it did not receive written notice until April 2002, well

after the claim was made in December 2000 and past the First Policy period which ended on

August 15, 2001, the reporting requirement was not fulfilled. Ness Motley argues that since Old

Republic had actual notice during the First Policy period, the reporting requirement has been

met[3].   Specifically, Ness Motley asserts that Terry Richardson and Francis Ray provided oral

---

[3]The court notes that there appears to be a tension in Illinois law regarding the reporting and notice provisions in claims-made policies.  As just stated by the court, "the essence of a claims made policy is notice to the carrier within the policy period."  *Executive Risk Indemnity, Inc.*, No. 03 C 3224, 2005 WL 1838433, at *6 (citations omitted).  Moreover, courts strictly construe such notification provisions and "the reporting/notice requirement in a claims made policy is 'considered [a] valid condition [ ] precedent and not just [a] technical requirement.'" *Id.* (citations omitted).  Thus, on the one hand, courts appear to require strict compliance with a notice provision in a claims made policy, particularly with respect to the timing requirement that the claim be made and reported within the policy period.  However, at least one court has held that the form of the notice is equally important as the timing--"[b]ecause the notice of claim provision defines coverage under this [claims-made] policy, the only reasonable interpretation of the policy provision is that the insureds must regard the information they possess as a potential claim and *formally notify their insurer through its claim liability department that a claim may be asserted.*" *American Cas. Co. of Reading v. Continisio*, 17 F.3d 62, 69 (3rd Cir. 1994) (emphasis added).

However – and this is where the tension arises – the Illinois Supreme Court has also held that "the insurer's duty to defend is triggered by *actual* notice of the underlying suit, regardless of the level of the insured's sophistication." *Cincinnati Cos. v. West Am. Ins. Co.*, 701 N.E.2d 499, 505 (Ill. 1998) (emphasis added) ("in order to have actual notice sufficient to locate and defend a suit, the insurer must know both that a cause of action has been filed and that the complaint falls within or potentially within the scope of the coverage of one of its policies.").  Thus, the implication of the holding in *Cincinnati Cos.* appears to be that strict compliance with a notice/reporting requirement in a claims-made policy (i.e., providing written notice directly to the insurer at a specific address) is unnecessary as long as the insurer has actual notice of the suit.

At least one other district court has addressed an insured's argument that the insurer had actual notice of a suit within the proper policy period of a claims-made policy, though ultimately rejected the arguments because the documents the insured relied upon were insufficient to allow the insurer to actually locate and defend the lawsuit on behalf of the insured.  *Abrams*, No. 99 C 5807, 2002 WL 243455, at *4-5.  Neither party directly addresses this apparent tension in the law in their summary judgment briefs.  Old Republic does argue that because the notice provisions in the Policies expressly required written notice to its underwriter, Chicago Underwriting Group, then oral notice to Spooky Weeks, an insurance broker in South Carolina that Ness Motley asserts was Old Republic's agent, was inherently insufficient.  However, in light of the *Cincinnati Cos.* holding that actual notice of a lawsuit suffices to impose a duty to defend and at least one other district court appears to assume that actual notice even in a claims-made policy might be sufficient notice, the court will also assume that actual knowledge can be enough.  Accordingly, it construes Ness Motley's reliance on Richardson and Ray's testimony as an argument that Old Republic had actual notice of the lawsuit within the appropriate period and address it as such.

To the extent, however, that Ness Motley attempts to assert that Old Republic had actual knowledge of the lawsuit within the period of the First Policy based on inferences the court is

notice of the claim during the First Policy Period.  Because it does not have specific testimony from either individual, Ness Motley relies on the custom and practice testimony of each individual.

Terry Richardson was on the Ness Motley executive committee that was responsible for professional liability matters for Ness Motley.  At his deposition, when asked if he recalled any conversations with Spooky Weeks[4] in December 2000 about the Underlying Action, Richardson testified as follows:

> A    "That would have been my practice but I can't tell you as I sit here right this moment that I specifically remember the conversation about this particular claim."
> Q    Do you recall ever speaking with Spooky Weeks about this particular claim?
>      . . .
> A    I think I did, I'd be surprised if I didn't, but I really don't have any specific date, time or recollection as to having done so.
> Q    Can you recall anything that you said to Spooky about this claim?
> A    No, no.

Earlier in the deposition, Richardson was also asked about giving notice to Old Republic.

> Q    Did you have any further communications with Blair Hahn [another Ness Motley lawyer] about placing any insurance carriers on notice of this Interclaim action?
>      . . .
> A    You know, usually how it would happen is one of the lawyers would call somebody on the executive committee, maybe me, maybe Joe, and say, listen, this claim's come in.  And at that time I'd either tell them to contact

---

supposed to make from Old Republic's "evasions" regarding its production of a proper 30(b)(6) witness, *see* Resp. at 10, this argument is rejected.  The court is unwilling to make such a critical determination based on inferences.

[4]Spooky is apparently the nickname of Harry Weeks, Jr., an insurance agent at the Hutson Etheredge Companies ("HEC") in South Carolina through whom Ness Motley bought its professional liability insurance.

Terre[5] or Francis or Spooky and let's be sure we get this thing defended. And sometimes I'd talked to Spooky, sometimes maybe we patched in Francis or Terre right that second and turned it over. So it could have been that Blair called me before this and said, all right, get with them, write us a memo about it. And whether I or he talked to Spooky or directly to Francis at that time, I don't know. But yesterday I saw a letter where Blair did in fact write the insurance company after this memo.

Ness Motley also relies on the testimony of Francis Ray, an accounting assistant who was hired by Ness Motley in 1994.[6] According to Ness Motley's statement of fact at ¶21, Ray reported the Underlying Action to Weeks. Contrary to the implication by Ness Motley that Ray spoke with Weeks soon after the claim was filed, Ray's testimony actually states that he could not recall when he contacted Weeks about the Underlying Action and that he would contact Weeks only if instructed by someone else. Despite the above testimony by both Richardson and Ray that they would likely have spoken with Weeks about the Underlying Action at or around the time it was filed, Weeks denies having any knowledge of the Underlying Action until the judgment was entered against Ness Motley in July 2003.

Evidence submitted at summary judgment must be admissible at trial under the Federal Rules of Evidence. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Old Republic

---

[5]It is unclear from the testimony who "Terre" is. However, Ness Motley's exhibit 24 is an affidavit from Terre Bohman which states that he was "in charge of" the accounting department at Ness Motley.

[6]Ness Motley refers to its additional statement of fact ¶21 in support of this statement. The court notes that this paragraph violates Local Rule 56.1 in that it is five sentences long and includes multiple facts in one paragraph. The court cautions the parties that compliance with the local rules is not a mere technicality. *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("We have also repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1.") (citations omitted). However, in its discretion, the court will not strike the statement of fact. To the extent that each party to the instant motions for summary judgment have filed motions to strike the other parties' statements of fact, they are denied unless stated differently herein.

argues that Richardson and Ray's testimony is inadmissible habit evidence without which Ness

Motley fails to create a genuine issue of material fact that it notified Old Republic of the claim

during the First Policy period.  Federal Rule of Evidence 406 provides that:

> Evidence of the habit of a person or of the routine practice of an organization,
> whether corroborated or not and regardless of the presence of eyewitnesses, is
> relevant to prove that the conduct of the person or organization on a particular
> occasion was in conformity with the habit or routine practice.

As the Advisory Committee notes to Rule 406 state, habit "describes one's regular response to a

repeated specific situation."

Old Republic cites to the following excerpt from a Seventh Circuit case addressing habit

evidence:

> before a court may admit evidence of habit, the offering party must establish the
> degree of specificity and frequency of uniform response that ensures more than a
> mere "tendency" to act in a given manner, but rather, conduct that is
> "semi-automatic" in nature. *See* Fed.R.Evid. 406 (Notes of Advisory Committee);
> 23 Wright and Graham, Federal Practice and Procedure, § 5273 (1980) p. 33
> (evidence of habit must be highly particularized); *See Wilson v. Volkswagen of
> America, Inc.*, 561 F.2d 494, 511 (4th Cir.1977) (pattern-of-conduct or habit
> evidence must be " 'numerous enough to base an inference of systematic conduct'
> and to establish 'one's regular response to a repeated specific situation' ").

*Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293 (7th Cir. 1988).

The Seventh Circuit has further stated:

> The party offering the evidence must establish the habitual nature of the alleged
> practice. * * * Although there are no precise standards for determining whether a
> behavior pattern has matured into a habit, two factors are considered controlling
> as a rule: adequacy of sampling and uniformity of response. * * * The factors
> focus on whether the behavior at issue occurred with sufficient regularity making
> it more probable than not that it would be carried out in every instance or in most
> instances. * * * The requisite regularity is tested by the ratio of reaction to
> situations. * * * It is essential, therefore, that the regularity of the conduct alleged
> to be habitual rest on an analysis of instances numerous enough to [support] an
> inference of systematic conduct and to establish one's regular response to a

repeated specific situation.

*Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994) (*quoting United States v. Newman*, 982 F.2d 665, 668 (1st Cir.1992), *cert. denied*, 510 U.S. 812 (1993) (quotations and citations omitted) (emphasis added).

However, in each of *Simplex* and *Thompson*, the court was concerned that the habit evidence being offered "will be used to establish a party's propensity to act in conformity with its general character, thereby thwarting Rule 404's prohibition against the use of character evidence except for narrowly prescribed purposes." *Simplex*, 847 F.2d at 1293 (citation omitted). That concern is not present here, and indeed, another court in this district has cautioned that the aforementioned "admonition cannot be read in a way that writes Rule 406 out of the Rules of Evidence." *Brennan v. The Paul Revere Life Ins. Co.*, No. 00 C 0725, 2002 WL 1284385, at *3 (N.D. Ill. June 10, 2002) (stating that evidence that tended to establish "the existence of a routine practice more directly , such as by showing an entity had a general policy, procedure or rule which covered the specific scenario involved . . . . does not implicate Rule 404(b)'s concern with the misuse of evidence of specific instances of conduct.").

Essentially, Ness Motley is attempting to show that it had a specific procedure in place by which it would notify its insurance carriers of any claims filed against it. The court finds that such evidence is admissible in this instance. *See Bowman v. Corrections Corp. of Am.*, 350 F.3d 537, 548-49 (6th Cir. 2003) (distinguishing *Simplex* on the ground that the testimony sought to be admitted in *Simplex* conflicted with Rule 404 while the evidence at issue in *Bowman* dealt with a warden's testimony as to whether he had received a phone call regarding an inmate's medical condition and the prison's "informal procedure" for dealing with phone calls from outside

sources).  Accordingly, the court concludes that the testimony of Ray and Richardson is admissible under Rule 406.

        b.    <u>Was Spooky Weeks Old Republic's agent for purposes of notification?</u>

Old Republic asserts that even if the testimony of Ray and Richardson is admissible as habit evidence, Weeks was not Old Republic's agent for purposes of notification of a claim under the Policies, and thus, notifying Weeks could not constitute actual notice.[7]

Ness Motley contends that although the court has determined that Illinois law applies to the case, South Carolina law applies to the issue of whether Weeks was Old Republic's agent. Under the doctrine of depecage, the court must identify each issue raised in a case and then determine the controlling law on an issue-by-issue basis.  *Wilkow v. Forbes, Inc.*, 99 C 3477, 2000 WL 631344, at *5 (N.D. Ill. May 15, 2000) (*citing Vantassell-Matin v. Nelson*, 741 F.Supp. at 704; Restatement (Second) of Conflicts § 145, comment d ("[e]ach issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states").

While the court determined that Illinois law applies to the contract aspects of this case, whether Weeks is an agent of Old Republic is an entirely different issue.  As such, the court will perform a conflict of law analysis as to the agency issue.  When exercising diversity jurisdiction, the court must look to the choice-of-law rules of the forum state, Illinois, to determine which state's substantive law should apply. *See, e.g., Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S.

---

       [7]In refuting that it had actual notice prior to April 2002, Old Republic also points to an affidavit of Michael Early, counsel for CUG, in which he indicated that CUG, as the designated agent for receiving notice for Old Republic, had no knowledge of the Underlying Action prior to April 15, 2002.  However, this testimony establishes that a genuine issue of material fact exists as to whether Old Republic had actual notice.

487, 497 (1941). Another court in this district has concluded after a detailed analysis that Illinois would follow the Restatement (Second) of Conflicts in ascertaining which state's law applies to an agency determination. *FASA Corp. v. Playmates Toys, Inc.*, 869 F. Supp. 1334, 1344 ("the court finds that the Supreme Court of Illinois would also adopt the Restatement (Second) for determining the applicable law in the agency context"). This court follows that well-reasoned analysis.

Section 292 of the Restatement (Second) of Conflict of Laws provides as follows

Contractual Liability Of Principal To Third Person:

(1) Whether a principal is bound by action taken on his behalf by an agent in dealing with a third person is determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction under the principles stated in § 6.
(2) The principal will be held bound by the agent's action if he would so be bound under the local law of the state where the agent dealt with the third person, provided at least that the principal had authorized the agent to act on his behalf in that state or had led the third person reasonably to believe that the agent had such authority.

The court finds that based on the above principles, South Carolina law applies to the question of agency. Both Weeks and Ness Motley were based in South Carolina and most if not all of their communications took place within the state of South Carolina. *Restatement (Second) of Conflicts of Laws*, § 292(2) ("The principal will be held bound by the agent's action if he would so be bound under the local law of the state where the agent dealt with the third person"). Moreover, because Old Republic sent its policies to Weeks in South Carolina to be forwarded to Ness Motley and had Ness Motley send its premiums to Old Republic through Weeks, South Carolina law controls the agency determination. *Restatement (Second) of Conflicts of Laws*, § 292, comment on subsection (1) ("A principal who authorizes an agent to act on his behalf in a

state assumes the risk that he will be held bound under the local law of that state by action, whether authorized or unauthorized, that is taken there by the agent on his behalf.").

Ness Motley asserts that under South Carolina law, the agency relationship in the insurance context is defined by statute. Section 38-43-10 of the Code of Laws of South Carolina states as follows:

> Persons considered producers of insurers; excess and surplus lines brokers; using assumed name.
> (A) A person who:
> (1) sells, solicits, or negotiates insurance on behalf of an insurer;
> (2) takes or transmits other than for himself an application for insurance or a policy of insurance to or from an insurer;
> (3) advertises or otherwise gives notice that he will receive or transmit insurance applications or policies;
> (4) receives or delivers a policy of insurance of an insurer;
> (5) receives, collects, or transmits any premium of insurance; or
> (6) performs any other act in the making of an insurance contract for or with an insurer, other than for himself; whether these acts are done by an employee of an insurer or at the instance or request of an insurer, must be an appointed producer of the insurer for which the act is done or the risk is taken unless provided otherwise in Section 38-43-20.

One South Carolina court has stated as follows in the context of construing the statute:

> Generally, an insurance broker is the agent of the insured, not the insurer. *Allstate Ins. Co. v. Smoak,* 182 S.E.2d 749 (S.C. Sup. Ct. 1971). The mere fact that he receives a commission from the insurer for placing the insurance does not change his character as an agent of the insured. *Id.* The terms agent and broker are not mutually exclusive. *Palmer & Cay/Carswell, Inc. v. Condominium/Apartment Ins. Servs., Inc.,* 306 S.C. 1, 409 S.E.2d 806 (Ct.App.1991). Under certain circumstances, a broker may be an agent for an insurance company. *Id.* A broker, who is the agent of the insured, cannot be converted by reason of the statute into an agent of the insurer without evidence creating an inference that he was acting at the "instance or request" of the insurer. *Allstate*, 256 S.C. at 386, 182 S.E.2d at 754.

*Hiott v. Guaranty Nat. Ins. Co.*, 496 S.E.2d 417, 421 (S.C. Ct. App. 1997).

Moreover, South Carolina law distinguishes between insurance agents and insurance

brokers. *See Holmes v. McKay*, 513 S.E.2d 851, 854-55 (S.C. 1999) (describing in detail the difference between an insurance agent and an insurance broker). *See also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 437 (4th Cir. 2003) ("Under South Carolina law, an 'insurance broker' represents people seeking insurance, while an 'insurance agent' represents the insurance company.") (*citing* S.C.Code §§ 38-1-20, 38-43-10 (2002); *Allstate Ins. Co. v. Smoak*, 182 S.E.2d 749, 753-54 (S.C. 1971) (distinguishing between insurance brokers and agents on basis of whether employed by person seeking insurance or by insurance company to solicit and write insurance)).

While the parties consistently refer to Weeks as a broker, the parties do not point to any facts allowing this court to ascertain with any degree of certainty whether Weeks is a broker or an independent insurance agent. Further, even if one is deemed an agent by reason of the statute, the extent of that authority must still be determined. *Id*. (citation omitted). "Usually, whether an agency relationship exists and the scope of the alleged agent's authority are questions of fact for the jury." *Holmes v. McKay*, 513 S.E.2d 851, 854 (S.C. 1999).

The court finds that genuine issues of material fact exist as to whether Weeks was Old Republic's agent with respect to notice of the claim. Weeks at least transmitted and delivered Old Republic's policies to Ness Motley, and received premiums from Ness Motley on Old Republic's behalf.[8]  Moreover, according to Ness Motley, Weeks was Old Republic's agent for accepting notice of claims because: (1) Weeks' commission was paid by Old Republic; (2) Weeks believed he needed Old Republic's permission before he turned over documents to Ness

---

[8]The court notes that Old Republic does not appear to argue that Weeks is not Old Republic's agent under South Carolina law, but only that he would not necessarily be an agent for all purposes (i.e., the extent of the agency). *See* Reply at 5.

Motley and that by virtue of the fact that documents were in his possession, they belonged to Old Republic; and (3) Old Republic sent all of its communications not to Ness Motley but to Weeks and only communicated with Ness Motley through Weeks' agency, HEC.

In response, Old Republic points out that Ness Motley has alleged in a state court action in South Carolina involving the same issues as the instant case that Weeks was Ness Motley's agent. Further, Old Republic notes that the Policies expressly state that notice of a claim is to be provided to it through CUG, and finally that Ness Motley had reported a different claim to CUG on January 17, 2001, and not through Weeks. The court finds based on the above that a genuine issue of material fact exists as to the extent of the agency relationship between Old Republic and Weeks. Finally, the court notes that whether Weeks is deemed a broker or an insurance agent under South Carolina could alter whether an agency relationship was created or at least affect the evidence that is presented in support of such a relationship. *See Holmes*, 513 S.E.2d at 856 ("Today, we hold that independent insurance agents' licenses with several insurers are, with respect to policies issued on the agents' efforts, *evidence of agency with and authority to speak for the insurers for which they are licensed*.") (emphasis added).

Even if the court were able to definitively state whether Weeks was an agent of Old Republic under South Carolina law, genuine issues of material fact exist as to the scope of that agency. Accordingly, the court denies Old Republic's motion for summary judgment as to Counts I and II.

c.     Ness Motley's Affirmative Defenses[9]

_____

[9]While Ness Motley has not cross-moved for summary judgment on the basis of its affirmative defenses, both parties address the defenses in their summary judgment papers. Accordingly, the court will address them in the interest of streamlining the issues for trial.

As to Counts I & II, Ness Motley asserts the affirmative defenses of estoppel, unclean hands, laches and waiver. The court will address these defenses in turn.

i. *Estoppel*

Before getting to the meat of Ness Motley's estoppel argument, the court must provide a bit of background. According to Ness Motley, Old Republic knew as of July 2000 that its formal policy to Ness Motley would not be issued for at least six months because it was waiting for Twin City (the primary insurer) to issue its policy, and Twin City had informed Old Republic that it would not be issuing its formal policy for six months. Accordingly, Old Republic issued a binder of insurance (i.e., a temporary policy), stating that the Binder Period was 8/15/2000 to 10/15/2000. The binder, however, also stated that the Policy Period was 8/15/2000 to 8/15/2001. Old Republic did not issue an extension of the binder; however, the final policy was sent to Ness Motley in January 2001.

Based on the above facts, Ness Motley asserts that it had no evidence of coverage by Old Republic from October 15, 2000 to January 2001, when it received the actual policy. Thus, Ness Motley's argument goes, when the Underlying Action was filed in December 2000 and Francis Ray of Ness Motley checked the firm's insurance files to see to whom the Underlying Action should be reported, Ray only saw the current binder from Twin City. As such, Ray told Blair Hahn, a lawyer at the firm who had inquired of Ray to whom the Underlying Action should be reported, only to report the claim to Twin City. Ness Motley concludes that "[t]he only inference from these facts is that the claim was not reported in writing to Old Republic at this time because of the expired binder." Resp. at 6. Ness Motley argues that Old Republic is estopped from attempting to evade liability based on no written notice because it was Old Republic's fault that

Ness Motley did not have evidence of coverage at the time the Underlying Action was filed.

While Ness Motley engages in an extensive discussion of this defense and cites to numerous cases supposedly in support, the argument is doomed by the fact that Ness Motley admits that it received the policy in January 2001, well before the end of the period of the First Policy on August 15, 2001. The First Policy clearly states on the front that the policy period was August 15, 2000 to August 15, 2001. This would have left Ness Motley approximately six and a half months to timely report the Underlying Action by the end of the First Policy. Moreover, it is undisputed that Ness Motley paid the First Policy premium for the full year (August 15, 2000 to August 15, 2001) by a check dated August 10, 2000. Thus, Ness Motley knew that it had coverage for the full year–indeed, it had paid $65,000 for that coverage. Finally, the court reiterates that while the binder stated that the Binder Period ended on October 15, 2000, it clearly stated *directly below* that line that the Policy Period was from August 15, 2000 to August 15, 2001.

Ness Motley's citation to *Salloum Foods & Liquors v. Parliament Ins.*, 388 N.E.2d 23 (Ill. App. Ct. 1979), is inapposite. In *Salloum Foods*, the policy at issue contained a provision stating that any lawsuits seeking recovery under the policy had to be filed within twelve months after "inception of the loss." *Id.* at 25. When it became apparent that a settlement of the claim with the adjuster was not imminent, plaintiff's counsel twice asked for the return of the insurance policy, which had been given back to the insurer when the policy was canceled for reasons not relevant here. The policy was never returned to the plaintiff. The plaintiff subsequently filed suit over one year after the robbery, and the insurer sought judgment on the ground that the suit was brought over one year after the robbery. The Illinois Appellate Court concluded that the plaintiff

had a right to a copy of its entire policy and the defendant's "unjustified and unexplained refusal to provide Salloum Foods with a copy of the policy . . . occasioned" the delay in the plaintiff filing suit. Thus, it held that the insurer was equitably estopped from raising the limitation provision as a defense." *Id*. at 31.

However, in the instant case, there is no evidence that Ness Motley had requested the policy or that Old Republic unjustifiably withheld a copy. Further, in the instant case, Ness Motley bought a one-year policy from Old Republic, paid the annual premium at the time of purchase and had a binder expressly stating that the policy period was from 8/15/2000 to 8/15/2001. Ness Motley has no basis on which to plead ignorance. Finally, while in *Salloum Foods*, the failure to receive a copy of the policy obviously acted to prejudice the plaintiff in that it filed suit too late, Ness Motley received a full copy of the policy on or around January 31, 2001, *approximately six and half months before the end of the First Policy period.*

Indeed, accompanying a copy of the First Policy was a letter from William Schwass at Old Republic stating that:

> The Insured should be made aware that all claims and/or incidents reported to the primary insurer must also be reported in writing to the Old Republic Insurance Company c/o Chicago Underwriting Group, Inc. Notification must be given regardless of the alleged or potential damages or the underlying limits of liability. Failure to notify the Old Republic Insurance Company of any claim or incident reported to the primary insurer could jeopardize coverage under the excess policy.

*See* Old Republic Exh. D-1 and Old Republic Statement of Fact, ¶26 and response.[10]

---

[10]Ness Motley denies ¶26, the statement of fact in which Old Republic asserts that the First Policy (which it erroneously called the Second Policy in its statement of fact) and the letter were sent to Ness Motley by Weeks on or about January 31, 2001. However, it appears that the basis for the denial is that the statement erroneously calls the First Policy the Second Policy. Ness Motley Response, ¶26 ("Denied. In 2001, Ness Motley received the First Policy not the Second Policy.") Ness Motley does not deny that it received the policy or the letter and provides

In *Salloum Foods*, the court rejected the plaintiff's other argument that the insurer was equitably estopped from relying on the limitations defense by investigating and negotiating the store's insurance claim and thereby somehow causing the plaintiff to believe it need not file suit:

> Following Ramsay's [the insurance adjuster] April 1976 letter [indicating that the adjuster's file was closed and directing plaintiff to the insurance company], a substantial period of time remained for Salloum Foods to file suit within the policy's one year limitation period. Neither Parliament nor its claims adjuster did anything thereafter to induce Salloum Foods to believe that its claim would be settled without suit. *When the alleged inducement for delay, in this instance Parliament's investigation and negotiation of Salloum Foods' insurance claim, has ceased to operate prior to the expiration of the policy's limitation period, so as to afford the insured a reasonable period of time within which to file suit, the insured's failure to institute such an action within the policy's remaining time period can not be excused on the grounds of equitable estoppel.*

Id. at 29 (citations omitted) (emphasis added).

Ness Motley's argument that it is unreasonable to state that it had some obligation upon receipt of the policy in January 2001 to "go back and check" for claims is rejected for the same reasons.

### ii.  *Prevention doctrine*

Apparently as an offshoot of its estoppel argument, Ness Motley argues that the wrongful prevention doctrine prohibits Old Republic from avoiding liability.  Under this doctrine, "a party who prevents the fulfillment of a condition upon which his own liability rests may not defeat his liability by asserting the failure of the condition he himself has rendered impossible." *Cummings v. Beaton & Associates, Inc.*, 618 N.E.2d 292, 303 (Ill. App. Ct. 1992).  The problem with this argument is that by failing to issue an extension of the binder, Old Republic did not render Ness

---

no citation to the record supporting a denial that it received both documents. As such, the court deems admitted this portion of ¶26 regarding receipt of the First Policy and the letter.

Motley's performance impossible. As noted above, Ness Motley bought a one-year policy from Old Republic, paid the annual premium at the time of purchase and had a binder expressly stating that the policy period was from 8/15/2000 to 8/15/2001. Most important, Ness Motley acknowledges that it received a copy of the policy in January 2001, with just less than seven months left in the First Policy period. As noted by Old Republic, Ness Motley must have known of the Old Republic policy as of January 17, 2001 because it provided written notice to Old Republic, through CUG, of another lawsuit on that date. Indeed, the January 17, 2001, letter copies Francis Ray, the administrative assistant at Ness Motley charged with control of the Ness Motley insurance policies and who was contacted by Blair Hahn just one month earlier regarding notice of the Underlying Action.

### iii. *Unclean Hands*

Ness Motley also argues that Old Republic's unclean hands prevent it from avoiding liability. According to Ness Motley, Old Republic erred by not issuing a binder extension to cover the period from October 15, 2000 to the date that it issued the actual policy (here, January 2001). Specifically, Ness Motley asserts that Old Republic "issued deceptive binders in the Fall of 2000, learned this by at least July 2001, and *consciously* avoided learning what claims may not have been reported because of its mistake." Resp. at 10 (emphasis in original). Ness Motley claims that Old Republic has unclean hands because it purposely did not notify the insureds that the binders issued in August 2000 were faulty, and that had Old Republic so notified them they would have promptly reported the Underlying Action within the First Policy Period.

However, the defense of unclean hands is disfavored and will be applied only if there is a showing of fraud or bad faith. *Schivarelli v. Chicago Transit Auth.*, 823 N.E.2d 158, 168 (Ill.

App. Ct 2005).  The evidence cited by Ness Motley in support of this defense, the testimony of

Perry and Schwass, fails to show fraud or bad faith or that Old Republic intentionally failed to do

anything when the binder error was discovered.  Perry's testimony answers questions regarding

why Old Republic decided to remove the "binder period" from the binder form (apparently after

the failure to issue a binder extension was discovered).  Schwass' testimony states that in 2001 a

decision was made to remove the binder period from the binder form.  When asked why the

binder period was dropped, Schwass replied:

> Because we were missing some expiration binders.  And, since we had
> accepted the premium, you really can't cancel coverage unless you
> formally send notice of cancellation.  There was no reason for us to
> continue using a binder, [sic] period.

NM Exh. 8 at 88.

Ness Motley's citation to *TRW Title Ins Co. v. Sec. Union Ins. Co.*, 153 F.3d 822 (7th Cir.

1998), does not alter this conclusion.  In *TRW*, the court found that because the plaintiff had

intentionally failed to investigate a risk in association with signing up a new title agent, it could

not succeed on an unjust enrichment claim.  *Id.* at 829 ("An unjust enrichment claim or other

equitable relief is denied to a plaintiff whose recklessness caused his claimed injury.").  As

noted, above, Ness Motley has not pointed to any similar evidence in this case.

This court thus rejects Ness Motley's claim that Old Republic intentionally issued a

binder that expired prior to sending out the actual policy in the hopes that Ness Motley would fail

to report a claim as it is simply not supported by the evidence – particularly in light of the fact

that (1) the "faulty" binder itself stated (directly underneath the binder period) that the policy

period was from August 15, 2000 to August 15, 2001, (2) Ness Motley had paid a premium for

the entire year in August 2000, and (3) Ness Motley clearly was aware of the Old Republic policy

in January 2001 because it properly reported another underlying action to Old Republic at that time.

### iv.    Waiver

As an initial matter, Ness Motley does not respond to Old Republic's argument that waiver is inapplicable. From what the court can discern from the waiver affirmative defense, Ness Motley is alleging that by either sending a "faulty" binder or not extending the binder to the date that the First Policy was issued, Old Republic has waived its right to demand proper notice of the claim.  However, waiver is the voluntary and intentional relinquishment of a known right, *Chatham Corp. v. Dann Ins*., 812 N.E.2d 483, 494 (Ill. App. Ct. 1994), and Ness Motley has not put forth any evidence that Old Republic made such a relinquishment.  In light of this failure to create a genuine issue of material fact that a waiver occurred, the court rejects this affirmative defense.

### v.    Laches

"Laches is 'the neglect or omission to assert a right which, taken in conjunction with a lapse of time and circumstances causing prejudice to the opposite party, will operate as a bar to a suit.'" *Mahoney v. City of Chicago*, 687 N.E.2d 132, 138 (Ill. App. Ct. 1997) (citation omitted). Old Republic argues that because laches requires a showing of prejudice or detrimental reliance, and Ness Motley cannot point to any detrimental reliance because it had plenty of time to report the Underlying Action in January 2001 and indeed reported another underlying claim on or around January 17, 2001.  As with waiver, while Ness Motley alleges laches in its affirmative defenses, it fails to respond to Old Republic's argument that the evidence does not support laches in this case.

However, it is unclear to this court what the basis for the laches defense is. As stated above, it is the neglect or omission to assert a right, and the court cannot discern what right Old Republic failed to assert. To the extent it is based on Old Republic's alleged delay in filing suit, as discussed below, Old Republic's duty did not arise until July 2003 (when judgment in the Underlying Action was entered and the excess policies were implicated), and this lawsuit was filed that same month. Accordingly, the affirmative defense of laches is stricken.

> vi.     *Old Republic's failure to issue a reservation of rights letter*

Ness Motley next alleges that the equitable defenses of estoppel, waiver, laches, and unclean hands also prevent Old Republic from asserting its coverage defenses because it waited from April 15, 2002 when it received written notice of the claim until December 4, 2002, to issue its reservation of rights letter. In response, Old Republic contends that as an excess insurer, it had no duty to issue a reservation of rights letter until exhaustion of the primary policy and its duty to defend was therefore triggered. *Montgomery Ward and Co. Inc. v. Home Ins. Co.*, 753 N.E.2d 999, 1006-07 (Ill. App. Ct. 2001) (rejecting estoppel and waiver arguments by the insured and stating that an excess insurer who has no duty to investigate or defend because excess coverage has not yet been triggered cannot be estopped from or has not waived asserting coverage defenses based on a failure to issue a reservation of rights letter).

Once again, Ness Motley fails to respond to this argument or point to any evidence supporting its contention that Old Republic is estopped from or has waived its right to assert coverage defenses because it failed to timely provide a reservation of rights letter. Indeed, Ness Motley admitted in its opening motion to dismiss or stay filed early in this case that:

> Old Republic . . . is not liable for defense costs, bonds, or other indemnification *unless and until Ness Motley's primary coverage provider [Twin City] . . . has*

*exhausted its $20 million coverage limit* in actual payment of loss. So far, about $1.5 million of the $20 million has been implicated in the Underlying Action.
. . .
Old Republic does not now have legal interests adverse to Ness Motley.

Docket No. 36 at pp. 1-2, 10 (emphasis added).

Then, in its reply on the same motion, Ness Motley stated:

Old Republic will only have an obligation to pay an amount in excess of $20 million in the event the appeal goes badly for Ness Motley. On the other hand, even a partial victory in the Court of Appeals may well *reduce the judgment below the $20 million figure necessary to trigger the excess coverage under the Old Republic policies.*

Docket No. 61 at p. 11 (emphasis added). Finally, in its response to Twin City's statement of material facts in support of its motion for summary judgment, Ness Motley answers "[a]dmitted" in response to the statement that "Ness Motley also had $10 million in excess coverage written by Plaintiff Old Republic, which could be triggered only if the underlying $20 million of coverage of primary insurance under the Twin City Policy was exhausted." Ness Motley Defendants' Response to Twin City's Statement of Material Facts, ¶17 at p. 7.

Thus, to the extent that Old Republic even had a duty to issue a reservation of rights letter as an excess insurer, that duty was not triggered until the judgment was entered in July 2003, after Old Republic issued its reservation of rights letter. Accordingly, any argument by Ness Motley based on this theory is rejected.

> vii. *Was the time period for reporting extended by virtue of the renewal?*

Ness Motley contends that the time period for reporting was extended because Old Republic extended its First Policy for a second year (i.e., the Second Policy). Ness Motley relies upon the fact that Old Republic's policy adopted Twin City's definition of "Loss" as being "to

the extent for which coverage would be provided under the Primary Policy [i.e., the Twin City policy]." According to Ness Motley, when the Primary Policy was extended, it "embraced claims reported within the two year time frame." Resp. at 12. Thus, goes Ness Motley's argument, the same must be so for the Old Republic Policies.

The court rejects this argument for two reasons. First, as noted recently by another court in this district, "[c]ase law in this District and elsewhere also militates against a finding that renewal of the policy created a single policy period for claims reporting purposes." *Chartered Benefit Servs.*, No. 03 C 3224, 2005 WL 1838433, at *9-10 *(citing Checkrite Ltd., Inc. v. Illinois Nat.'l Ins. Co.*, 95 F. Supp. 2d 180, 194 (S.D.N.Y. 2000) ("[M]ost courts . . . . have concluded that a renewal does not extend the reporting period for claims made during the earlier policy period."). *See also National Union Fire Ins. Co. of Pittsburgh, Pa. v. Bauman*, No. 90 C 0340, 1992 WL 1738, at *10 (N.D. Ill. Jan. 2, 1992) ("[T]he well established desire for actuarial certainty that underlies claims made coverage thoroughly undermines the.. 'one reporting period' argument. In order for the insurer 'to set its future premiums and reserves with full knowledge of the outstanding claims it is obligated to meet,' strict adherence to the reporting provision is required.") (citations omitted).

Moreover, as Old Republic points out, the Policies expressly state that they do not adopt or follow Twin City's limits of liability or policy period. The Insuring Agreement provides that coverage is provided "subject to the same warranties, terms, conditions, exclusions, and limitations (except as regards the premium, the amount and limits of liability, the policy period, the extended reporting period . . . ) as are contained in or as may be added to the [Twin City Policy.]." Thus, the court rejects Ness Motley's argument that the reporting period was

extended.

*viii.*     *Monitoring*

Ness Motley also contends that Old Republic's position that it had no duty to do anything prior to July 2003 is inconsistent with Old Republic's representation that it was monitoring the situation. However, it is entirely unclear to this court what the legal basis of the argument is.

According to Ness Motley, Old Republic sent a reservation of rights letter to Ness Motley on April 24, 2002. This letter "acknowledges receipt of the initial notification [by Ness Motley] of this matter on April 19, 2002." The letter goes on to state that the Old Republic policy provides coverage in accordance with many of the terms of the primary (i.e., Twin City) policy, and thus requests of a copy of the reservation of rights letter from Twin City to Ness Motley. It then states that "[w]e will monitor this matter to its conclusion, regardless of whether it appears the Old Republic limit of liability will be involved."

Ness Motley contends that the letter "omitted all coverage defenses that would have alerted Ness Motley to a serious conflict of interest between it and Old Republic." Again, it is unclear what the purported conflict is, but it appears to be that Old Republic told Ness Motley it would be "monitoring" the situation, apparently in an attempt to lull Ness Motley into false sense of security that coverage would be provided, while at the same time soliciting additional business from Ness Motley.

This supposed conflict of interest is not a conflict at all. The letter Old Republic issued was a reservation of rights letter expressly stating that it was reviewing all of its rights under the policy until it had an opportunity to review the information sent by Twin City to Ness Motley. The letter essentially put Ness Motley on notice that Old Republic might seek to avoid liability

under the Policies; thus, Ness Motley could have taken this into consideration when fielding any future solicitations for business from Old Republic.  The fact that Old Republic stated that it was going to "monitor" the matter is throwaway language–there was no promise or even implication to do anything on Ness Motley's behalf.  Moreover, as this court has already noted, Old Republic's liability as an excess insurer did not trigger until the excess policy was implicated, which was *after* the April 24, 2002 letter.

2.      *Count VIII – Coverage for Punitive Damages Prohibited by Public Policy*

a.      <u>Does Illinois public policy prohibit insurance coverage for punitive damages</u>?

According to Old Republic, Illinois' public policy prohibits insurance coverage for punitive damages arising out of one's own conduct.  *Beaver v. Country Mut.*, 420 N.E.2d 1058, 1061 (Ill. App. Ct. 1981).  Thus, it asserts that, because Ness Motley was found directly (as opposed to vicariously) liable to Interclaim in the Underlying Action, insurance coverage for the punitive damages is prohibited by Illinois law.[11]

Ness Motley's main argument in response is that Illinois law allows for coverage of punitive damage awards based on vicarious liability and that the jury verdict does not indicate that it was for direct rather than vicarious liability.[12]  Thus, it concludes that summary judgment

---

[11]To the extent that Old Republic contends that this court already "ruled" that Ness Motley was directly liable, it is incorrect.  It is true that this court stated in an earlier order that Ness Motley had been found directly liable in the underlying action.  This statement was based on its understanding at that time of the judgment in the underlying action.  However, to assert that the court "ruled" or "held" this as a matter of law is inaccurate as the parties had not briefed this specific issue.

[12]The court assumes that Ness Motley's argument in this regard applies only to the breach of fiduciary duty count.  The jury clearly found that Ness Motley was liable for breach of contract given that Ness Motley itself was a signatory to the retainer agreement with Interclaim.

on this basis must be denied because a genuine issue of material fact exists as to whether the punitive damage award was direct or vicarious.

In support of its argument that the award was based on Ness Motley's direct liability, Old Republic points to the following:

–William Narwold, an attorney and one of Ness Motley's 30(b)(6) witnesses, stated that "if there were no charge on vicarious liability and the claim was that Ness Motley breached its duties to its client, then the claim would be directly against Ness Motley."[13]

--Interclaim's counsel, Stahl, testified that "My understanding was that Ness Motley was being sued as the party that had entered into a retainer agreement with Interclaim; and Ness Motley, a partnership or professional [sic], had breached other duties." Stahl also testified that the amended complaint by Interclaim in the Underlying Action did not include a claim for vicarious liability.

–In its Third Amended Counterclaim, Ness Motley states that the Underlying Action "alleged various acts and omissions of *Ness Motley* arising out of *its* having provided legal services in connection with class action claims in 2000. . . ." (emphasis added).

–No mention of vicarious liability is found in the jury instructions in the Underlying Action. Indeed, the jury instructions for the breach of fiduciary duty count specifically stated that punitive damages could be awarded "[i]f you find that *Ness, Motley's* conduct in breaching its fiduciary duty was willful and wanton...." (emphasis added). The jury instructions for punitive damages relating to the breach of contract count state that factors to consider in assessing punitive damages are: "[t]he character of *Ness, Motley's* acts; the nature and extent of the harm to Interclaim which *Ness, Motley* caused or intended to cause; *Ness,*

_____

*Interclaim.* 298 F. Supp. 2d at 750 ("On February 14, 2000, Interclaim and Ness Motley executed a retainer Agreement . . . .").

[13] Although the 30(b)(6) witness, Narwold, submitted an errata sheet subsequent to the deposition in which he attempted to change this statement to: "The judgment entered against Ness Motley was for its vicarious liability, based on the behavior of Hahn and Brickman," this change cannot be countenanced. *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) ("a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'").

*Motley's* degree of culpability. . . ." (emphasis added).

–Further, throughout her order denying Ness Motley's motion for a new trial in the Underlying Action and to vacate the punitive damages award, Judge Pallmeyer only referred to the evidence and jury findings against Ness Motley.[14] *Interclaim*, 298 F. Supp. 2d at 764 ("*Ness Motley* repeatedly deceived Interclaim and the class . . . .", "*Ness Motley* falsely led Interclaim to believe that it would cease negotiations. . . .," "*Ness Motley* misappropriated proprietary information").

Citing to *Commercial Union Ins. v. Ramada*, 852 F.2d 298 (7th Cir. 1988), Ness Motley responds that it is unclear from the jury instructions whether the basis for the award was direct or vicarious liability, and as such, Old Republic cannot meet its burden of showing that the award was based on direct liability. In *Ramada*, the court addressed an analogous situation to the one at hand – that is, an insurance company brought an action seeking a declaratory judgment that a punitive damages award in an underlying action was not covered by the policy because Indiana law prohibited insurance coverage for punitive damages based on direct liability.

The underlying action had been brought by an individual who was involved in an altercation with a security guard at a Ramada Hotel. The plaintiff sued both the security guard and Ramada, but dismissed the security guard as a defendant just prior to trial. In addition to compensatory damages, the jury in the underlying action awarded the plaintiff punitive damages, which amount was subsequently reduced by the district court judge. In the subsequent declaratory judgment action by the insurance company, the district court granted judgment to the insurance company on the ground that the jury's punitive damage award in the underlying action was based on Ramada's direct liability. *Ramada*, 852 F.2d at 301-02 ("The district court based its determination that Ramada's punitive damages liability resulted from its direct conduct solely

_____

[14]Indeed, after a careful review of Judge Pallmeyer's order, this court cannot find one reference to any particular associate or partner at the firm.

on the inferences it drew from the state court jury instructions and verdict.").

In deciding whether the district court made the proper determination, the Seventh Circuit engaged in a detailed review of the jury instructions provided in the underlying action. The underlying action had been based solely on a negligent retention theory against *Ramada* and three instructions were provided to the jury as to that theory. *Id.* at 302-03. However, because one of the negligent retention instructions required the plaintiff to show that the guard had committed an assault and battery, the jury was given five instructions regarding the intentional tort of assault and battery, and the defenses of self-defense, assumption of risk and contributory negligence.

Several problems existed with these additional instructions. First, one instruction inadvertently referred to "defendant Williams [the security guard]" even though he had already been dismissed from the case, while others referred to "the defendants." *Id.* at 303. The court stated that these instructions "may well have led its members to believe or presume that the actions of Williams and Ramada could be viewed jointly as the acts of 'defendants' or 'the defendant' for the purpose of assessing Ramada's liability to Hall." *Id.* Second, the interplay of two of the instructions led the Seventh Circuit to conclude that "these instructions provided the jury with the option of assessing punitive damages against Ramada based upon the willful and reckless conduct of the security guard." *Id.* The Seventh Circuit concluded that:

> The focus of [certain] instructions . . .on the actions of security guard Williams and the express reference to 'defendant Williams' in [instruction] B-26 alone are sufficient to raise a real possibility that the jury may have believed it could award punitive damages to Hall based only on a finding that security guard Williams acted in a 'abusive, wanton or oppressive manner . . . ,' thereby rendering Ramada vicariously, and not directly, liable. . . .

*Id.* at 305.

Unlike the case in *Ramada*, Ness Motley has failed to point to any instructions that could

have led the jury to believe that it was imposing punitive damages based on someone else's conduct. Ness Motley blithley asserts that "[t]he instructions on the Illinois breach of fiduciary duty count allowed for punitive damages based on conduct of Blair Hahn, a firm associate [who was involved in the misconduct in the Underlying Action]." Resp. at 16. Not only does Ness Motley not cite to the record in support of this statement, but the court's review of the breach of fiduciary duty punitive damage instruction shows that it mentions nothing about Blair Hahn. The only reference is to conduct by Ness Motley. Indeed, the underlying instruction as to the breach of fiduciary duty states that Interclaim had to show that: (1) *Ness Motley* breached one or more of its fiduciary duties to Interclaim; and (2) *Ness Motley's* breach of fiduciary duty was the proximate cause of Interclaim's damages. *See* Ness Motley Exh. 31 at p. 30-33 (emphasis added). There is no mention of Blair Hahn or any other employee or agent.

Ness Motley also asserts that the punitive damage instruction allowed the jury to impose liability without a showing of corporate complicity. However, this statement implies that Ness Motley as a firm could not have owed a fiduciary duty to Interclaim, which is simply not the case. While Ness Motley could only act through its employees, the firm itself still owes a fiduciary duty to its clients. Indeed, the jury was instructed that "[a] *law firm* owes its clients utmost fidelity, honesty, loyalty and good faith in the discharge of contractual obligations to, and professional dealings with, a client." Ness Motley Exh. 31 at p. 31 (emphasis added). .

The court finds that, as a matter of law, the punitive damage award was based on Ness Motley's direct liability. However, this does not end this court's consideration of the issue. The court notes that while the public policy against insuring punitive damages for direct liability is well-recognized in Illinois, the Illinois Appellate Court has held that:

> [W]e are of the opinion that a stronger and more fundamental policy of Illinois is that when payment of a premium is made by an insured and accepted by the insurance company and coverage is promised in return therefor, the insurer should be required to fulfill its contractual obligations. *See e.g., Strzelczyk v. State Farm Automobile Insurance Co.* (1986), 113 Ill.2d 327, 100 Ill.Dec. 808, 497 N.E.2d 1170; *Kaufman v. Economy Fire & Casualty Co.* (1979), 76 Ill.2d 11, 27 Ill.Dec. 742, 389 N.E.2d 1150.

*International Surplus Lines Ins. Co. v. Pioneer Life Ins. Co. of Ill.*, 568 N.E.2d 9, 17 (Ill. App. Ct. 1991); *Glidden v. Farmers Automobile Ins. Ass'n.*, 312 N.E.2d 247, 250 (Ill. 1974) (finding it improbable that insured would pay premiums on three different policies while intending that its coverage would be reduced to what would have been provided under one policy). *See also Bremen State Bank v. Hartford Accident & Indemnity Co.*, 427 F.2d 425, 427 (7th Cir. 1970) ("It is well settled under the law of Illinois, as well as most other jurisdictions, that if an insurer does not intend to insure against a risk which is likely to be inherent in the business of the insured, it should specifically exclude such risk from the coverage of the policy.").

Given the apparent overriding interest articulated by Illinois courts in having an insurance company provide coverage that is contracted for,[15] the court cannot state as a matter of law that Old Republic should be granted summary judgment on the asserted ground that punitive damages for direct liability are against public policy. Accordingly, the court denies summary judgment as to Count VII.[16]

---

[15]Old Republic attempts to distinguish *International Surplus* on the ground that the court there found that the insured had paid a specific premium for punitive damages coverage. *International Surplus*, 568 N.E.2d at 12. However, in *International Surplus*, the Illinois Appellate Court stated generally that Illinois' "stronger" public policy was that when an insured paid for coverage, it would receive that coverage. There is no indication in that statement that the coverage had to paid for separately from the regular premium.

[16]Given that the court has denied summary judgment on this count, the court need not address the issue of whether Ness Motley's fraud counterclaim precludes entry of summary

3. *Count VI – Coverage for Punitive Damages is Barred by Fraudulent Conduct Exclusion*

a. <u>Was the award in the Underlying Action based on an act, error or omission committed with "actual dishonest, fraudulent, criminal, or malicious purpose or intent?"</u>

Old Republic contends that it is off the hook because the punitive damage award was based on Ness Motley's breach of contract and/or breach of fiduciary duty – both of which it argues required a showing of fraud, dishonesty, or malice.[17]

As to the breach of contract count, Old Republic points out that punitive damages could only be awarded in the Underlying Action if the breach of contract was accompanied by fraud. *Interclaim Holdings, Ltd. v. Ness, Motley, Loadholt, Richardson & Poole*, 298 F. Supp. 2d 746, (N.D. Ill. 2004) ("Underlying Action") ("Under South Carolina law, punitive damages are available for a breach of contract where it is accompanied by a fraudulent act.") (citations omitted).[18]  Indeed, the jury instructions for the breach of contract count in the Underlying Action included the following:

> A person may recover punitive damages for breach of contract accompanied by a fraudulent act.  However, mere breach of contract, even if willful or with

---

judgment.  Because Ness Motley did not cross-move for summary judgment, it will be left for Ness Motley to prove its fraud claim at trial.

[17]The jury in the Underlying Action did not articulate its basis for finding that punitive damages were warranted.  The verdict form as to punitive damages simply asked if "Interclaim [had] proven that it is entitled to an award of punitive damages," which was answered "Yes." The verdict form then asked the amount and the jury stated "$27.7 million."  Thus, the punitive damages award could be based on either the breach of contract count or the breach of fiduciary duty count or both.

[18]"Ness Motley conceded that South Carolina law governed the breach of contract claim and specifically agreed to a punitive damage instruction drawn from the South Carolina Code." *Interclaim*, 298 F. Supp. 2d at 762 (citation omitted).

> fraudulent purpose, is not sufficient to entitle a plaintiff to a punitive damages award. *It is the accompanying fraudulent act that allows recovery for punitive damages. Absent a fraudulent act accompanying the breach, there could be no recovery for punitive damages on the breach of contract count.*

Old Republic Statement of Fact, at ¶69 (emphasis added).

Ness Motley argues that the jury instruction for the breach of contract stated that "[a] misrepresentation made in reckless disregard of the truth will support an action for breach of contract accompanied by a fraudulent act." However, while this may be true, it does not negate the fact that the breach of contract count requires a finding of fraudulent conduct in order for the jury to have imposed punitive damages. If the breach of contract count were the only one at issue, this court would have no problem finding that the exclusion at issue applies.

However, because it is not clear on which count the jury based its award of punitive damages, the court also addresses the breach of fiduciary duty count. The jury concluded in the Underlying Action that Interclaim proved its breach of fiduciary duty claim. Again, however, the basis for the punitive damages award is unclear. Old Republic argues that it was based on "actual dishonesty." *Interclaim*, 298 F. Supp. 2d at 751 ("[a]t trial, Interclaim argued that Ness Motley breached its fiduciary duties of loyalty, *honesty*, and fidelity . . . "), and points to Judge Pallmeyer's denial of Ness Motley's motion to vacate the punitive damages award.

In her order on the post-trial motions, Judge Pallmeyer noted that Interclaim had presented substantial evidence of "Ness Motley's *repeated and deliberate acts of deception.*" *Interclaim*, 298 F. Supp. 2d at 764 (emphasis added). Judge Pallmeyer also noted that Interclaim presented evidence that "Ness Motley *repeatedly deceived* Interclaim and the class . . . .", *id.* (emphasis added), and that "Ness Motley *falsely* led Interclaim to believe that it would cease negotiations. . . ." *Id.* (emphasis added). Moreover, Judge Pallmeyer stated in her order that:

the jury reasonably concluded that Interclaim suffered harm when, among other fiduciary and contractual breaches, *Ness Motley misappropriated Interclaim's proprietary information and used it to negotiate a proposed settlement that resulted in the dissipation of $50-$60 million in assets* identified, located, and frozen by Interclaim.

*Id*. at 763 (emphasis added).  In light of these statements, Ness Motley's assertion that Old Republic has no record evidence to support its contention that the punitive damages award could have been based on actual dishonesty rings hollow.

Old Republic also refers to the jury instruction for the breach of fiduciary duty count which stated in part:

> If you find that Ness Motley's conduct in breaching its fiduciary duty was willful and wanton and proximately caused injury to Interclaim you may . . . award an amount which will serve to punish the defendant and deter the defendant and others from similar conduct . . . The words recklessness, willfulness and wantonness are synonyms. . . . Recklessness is an awareness of wrongful conduct and a continuation to act regardless of consequences.

According to Old Republic, the dictionary definition of willful and wanton (as provided in the jury instruction) is the equivalent of "malicious."  Therefore, Old Republic asserts that if the punitive damage award were based on the breach of fiduciary count, it would have had to have been based on malicious and willful conduct and thus, the exclusion for actual dishonest, fraudulent, criminal, or malicious purpose or intent applies.  This court agrees.  *State Farm Fire & Cas. Co. v. Martin*, 710 N.E.2d 1228, 1233  (Ill. 1999) (stating that defendant's hiring someone to set a building on fire was willful and malicious as a matter of law and therefore the exclusion for willful and malicious conduct clearly applied).

Ness Motley's response does not alter this conclusion.  Specifically, Ness Motley asserts that the use of the words willful, wanton and reckless in the instructions differs from the definition of those words in Black's Law Dictionary.  Ness Motley contends that the connotation

in the definitions in Black's Law Dictionary are that willful and malicious conduct must be premeditated and done intentionally while the jury instructions simply require "reckless" behavior which includes situations in which a defendant "does not realize he is invading the plaintiffs' rights." However, the language of the instruction itself contradicts Ness Motley's reading of it – the instruction itself states that recklessness, wilfulness and wantonness are synonyms and that "recklessness is an awareness of wrongful conduct and a continuation to act regardless of consequences." Thus, the court rejects Ness Motley's attempt to create a distinction without a difference.

Ultimately, however, even if the exclusion applies, Ness Motley raises the point that the exclusion expressly states that it "shall not apply to insured(s) who did not commit or personally participate in such act, error, or omission." Indeed, the policy page following the fraudulent conduct exclusion includes a section entitled "Waiver of Exclusions and Breach of Conditions" which states in part that whenever coverage is excluded based on the fraudulent conduct exclusion:

> the Company [Old Republic] agrees that such insurance as afforded under this policy shall apply with respect to each and every insured *who did not personally commit or personally participate in committing one (1) or more of the acts, errors, or omissions described in any such exclusion . . . .*

Old Republic Exhibit B-41 and C-20 (emphasis added).

Old Republic does not address this waiver and has not pointed to any record evidence that the exclusion should apply to Ness Motley as a firm rather than the specific individuals involved in the fraudulent conduct. As such, the court denies Old Republic's motion for summary judgment as to this count.

4. *Count X – Request that any declaration "bind" Twin City*

As for Count X, Old Republic asks that this court "bind" Twin City, Ness Motley's primary insurer and a named defendant in this declaratory judgment action, to any summary judgment that may be entered as a result of its motion. Given that summary judgment has not been granted on any of the counts at issue, this request is moot.

However, even if it were not moot, this court would deny it. Obviously, to the extent that Twin City's interests have been represented in this case on a particular issue, it is subject to any collateral estoppel that applies as a result of this court's judgment. However, even if this court had entered summary judgment on Old Republic's behalf, it could not have "bound" Twin City to the decision (at least in the way the court understands Old Republic to want it to) given that the merits of the case between Twin City and Old Republic have not been hashed out here. There has been little to no discussion or argument between these parties as to the legal or factual bases of the rights and responsibilities they owe one another in the context of the Underlying Action.[19] Accordingly, for this court to hold that Twin City is "bound" by the judgment in the way that this court understands Old Republic to want it to do is improper at this time.

### B.       Twin City's Motion for Summary Judgment[20]

Twin City also seeks summary judgment on two grounds. First, it asserts that no case or controversy exists between Old Republic and Twin City. Twin City argues that because the First

---

[19]Indeed, Old Republic states that the issue of Twin City's obligations to Old Republic (and presumably vice versa) regarding the Underlying Action is in part the subject of another proceeding pending before Judge Guzman in this district, *Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, No. 04 C 8335.

[20]Ness Motley has filed a response to Twin City's motion for summary judgment. However, given that Twin City's motion is not directed toward Ness Motley, Ness Motley's response is stricken as unnecessary.

Amended Complaint only frames a dispute between Old Republic and Ness Motley, Old

Republic has not asserted any claim against Twin City.  It, therefore, concludes that absent any

actual controversy, the court lacks jurisdiction over Twin City.

Old Republic argues that an actual and present controversy exists between the parties and

that a declaratory judgment action is a proper vehicle for resolution of that controversy.  This

court agrees.  Twin City's argument that this court has no jurisdiction over a case between these

two entities is belied by the fact that a case involving these two parties is currently pending

before Judge Guzman.  According to Old Republic's statement of facts, the case in front of Judge

Guzman, at least in part, addresses the rights and responsibilities of Twin City to Old Republic

and vice versa as to the Underlying Action.[21]

Indeed, Twin City's argument that an actual case or controversy does not exist is belied

by the fact that it refuses to disclaim any causes of action it may have against Old Republic as a

result of the settlement between Twin City and Ness Motley.[22]  While it is true that the

allegations of the First Amended Complaint against Twin City are relatively sparse, the prayer

---

[21]It is not clear to this court why (in terms of judicial efficiency) Twin City is a defendant
in this case if the rights and responsibilities of these two parties regarding the Underlying Action
are being litigated in front of Judge Guzman.  In any event, this court cannot make any
declaration as to the rights and responsibilities between Twin City and Old Republic without
substantive argument as to those issues.  Moreover, this court is hesitant to make substantive
rulings in light of the pending litigation before Judge Guzman.

[22]Referring to an affidavit submitted by one of its attorneys, Old Republic states that in
July 2005, it offered to voluntarily dismiss Twin City from this case if Twin City agreed not to
seek reimbursement from Old Republic for any amounts Twin City paid toward the defense or
settlement of the Underlying Action.  the affidavit states that about one month later, counsel for
Twin City indicated to counsel for Old Republic that Twin City would not make any such
representation to or agreement with Old Republic.  *See* September 6, 2005, Affidavit of Steven
Ciszewski, attached as Exhibit 1 to Old Republic's Response to Twin City Insurance Company's
Local Rule 56.1(A)(3) Statement, Additional Facts, ¶2.

for relief asks that this court declare that "Old Republic has no duty to make any payment (by contribution or otherwise) or provide any coverage under the Old Republic policies to Twin City in the Underlying Action." Given that such a declaration cannot be made without addressing the merits of the claim, in combination with the requirement only of notice pleading in federal court, the court finds that the case or controversy element of jurisdiction is secure. In light of this ruling, the court need not address Old Republic's arguments regarding compulsory counterclaims and estoppel.

Second, in Twin City's motion for summary judgment, it argues that it entered into a settlement with Ness Motley by which Ness Motley executed a full release and Twin City paid in excess of its $20 million policy to settle the Underlying Action. Accordingly, Twin City argues that Old Republic, as Ness Motley's subrogee, cannot assert any claims against Twin City given Ness Motley's release.

However, as noted above, any declaration as to the rights and responsibilities between these parties is premature and this court is loathe to begin making rulings as to these parties when another case is already pending. In any event, the court is not convinced by Twin City's argument that Old Republic cannot sue it for a declaratory judgment based on a release to which it was not a party, but, at the same time, Twin City can sue Old Republic to recoup monies it paid in excess of its primary policy.

## IV.      CONCLUSION

For the reasons stated above, Old Republic [313-1] and Twin City's [306-1] motions for summary judgment are denied. Ness Motley's response to Twin City's motion for summary judgment [335-1] is stricken as unnecessary.

ENTER:

**Blanche M. Manning**
**United States District Judge**

**DATE:** January 11, 2006